We'll hear U.S. v. Ramos, 23-607-1, and we'll hear from Ms. Kivill. Thank you, Your Honor, and may it please the Court. My name is Shira Kivill, and I am a federal public defender. I represent Isaac Ramos. Your client is to be released in about a year, year and a month? Yes, his release date is in December, and we do have a pending motion for bond pending appeal below, but it has not been rolled on yet. I just wanted to make sure I had the time right. Yes. The police here had no real need to impound Isaac Ramos's tow truck from the small-town Minimart parking lot where he'd been arrested, and Officer Puentes had many workable alternatives. Not only does every Sanders factor point away from impoundment in this case, but the Department's own policy manual forbade it, and this Court should reverse. I'd like to start just by going through the Sanders factors, which makes clear that this was an unreasonable search and seizure. First, the truck was on private property. This Court has said that factor always weighs strongly against impoundment. Second, the private property owner was never consulted. If the police, as they did here, merely infer what the private property owner may have wanted, that factor weighs against impoundment. Third, Officer Puentes had three obvious alternatives. Let Mr. Ramos call his mother like he asked, let him call for a private tow, or simply secure the truck and leave it until morning. Fourth, the tow truck was not implicated in any crime, as the government admits, and that means you don't have this additional reason that those other alternatives might be unworkable. And fifth, again, as the government concedes, the driver-owner did not consent to the impoundment. I'm ready for questions. Okay, so I just wanted to ask you about the sign issue, and particularly the standard. Now, Judge Dishman is essentially acting as the fact finder. She hears Officer Puentes' testimony about what that customer's only violators towed means. Because she is interpreting Officer Puentes' testimony, on that limited fact, do we apply the clear error standard to her interpretation of that signage? No, Your Honor, because the testimony that she credited here from Officer Puentes, which is in her findings at R1-397, is that he testified that he would not leave the truck parked overnight because the store had a posted sign that prohibited parking to non-customers. And then on page 408, his only knowledge is what is posted on the sign. And so what we have here is we have a litany of logical leaps that he has to make. We have this sign. If you can look in the exhibit, it's right on top of the open hours for the store. So Officer Puentes is saying to himself, well, this could mean only customers during business hours, and we want to keep our spaces open for them. I'm going to reject that. It could mean only people who were ever customers, because we don't want to just serve as a place for people to store their cars. I'm going to reject that. I'm going to make this conclusion, based on my inferences, that this means even after hours, even right after he bought something from the store, they don't want his car here. And moreover, they want us to impound it because it is a nuisance. And that's why now we have this community caretaking interest in interfering with what would normally just be a non-criminal dispute over private property. So in this case, no, I don't think you defer to anything. There's no sort of finding here to defer to. And this court clearly stated in Woodard that it's not enough to infer. You have to ask and receive information. And further, Officer Puentes could have asked. Normally, it was the clerk in the store, and he had a conversation with her. But he's about to have another conversation with her. And you can hear on the lapel video that he knows, he speaks to the other officer on scene, that Connie's the manager. So he knows who the manager is. There are lots of ways for him to receive this information if he thinks it's particularly important. I was on that fifth factor of just saying, you know, to the contrary, Mr. Ramos asked to call his mom to come get the truck, and that was without even being told that it would be impounded. He simply, this was something that he wanted back with his family. Can I add, I'll tell you what's bothering me, is the concept that the truck was running, and the keys were in it, so some affirmative action had to be taken to defer to that. And you can't just leave it there. I mean, that's just common sense. But that was never a state of concern of the Winchester's. As far as I could tell, that didn't bother him, that he'd just go turn off the engine, get the keys, and turn them over to the towing service. We are so used to talking about objective reasonableness, and not the subjective views of the officer. Is this a different case where you do pay attention to the subjective views, and the fact that Fuentes was not concerned about this, means that's not a factor? I think that this is a case, yes, it's different than the norm, but you pay attention to both. I think Vinicia makes it really clear, you're both looking for subjective things like pretext, or I always do this, which is something Fuentes said here, and those are important and problematic. And you also look objectively, is this actually justified by a reasonable community caretaking rationale? And I think that the reason that the engine is on, was barely mentioned below, and not a big deal, is because that's not unusual. You're often going to have impoundments after a traffic accident, or decisions to make for the police, do I impound or not? There's a traffic accident, I've pulled somebody over, maybe the engine's running, because I asked them to get out of the car and they left the heat on, maybe the keys are still in the ignition and the window's open, the car is unlocked, you're often going to have a situation where the car is not yet secured. But it is something that we expect of police officers, that as a reasonable alternative to impoundment, something that is so much less intrusive, that they will secure the car. We do have cases where sometimes it's impossible to secure it, maybe you have a pickup truck and there's stuff in the back and no way to cover it, and you're going to have a different situation. But to say, as the government does in their answer brief, because it was not yet secured, now we can impound it, instead of merely turning it off and putting the keys in Mr. Ramos' private property, which is what we would do if they were in his pocket at the time, I don't think that that's a massive leap. We're talking about something very different than the criminal context, where you're looking for reasonable, articulable suspicion. It's not enough here that an officer can articulate a community caretaking rationale. The question is whether that justifies the impoundment. We're talking about something that the impoundment situation, you may not find any evidence, any contraband. Presumably you're often not going to find contraband, and yet you have citizens who are going to rack up impoundment fees, they're going to rack up the storage fees, and it's going to make it so they don't have access to their car, they can't go to work, they can't go to school, they can't perform their job. So it is an extreme interference beyond just the intangible interference with private property. And it needs to be justified by these reasonable community caretaking rationales. So here, okay, there's a license plate inside the car, which the district court was very concerned about. In Venezia, the license plate was inside the car. This is mentioned in the dissent in Venezia. I did not put it in my brief. Just jurisprudentially, this happens sometimes, when somebody will rely on a fact that's mentioned in the dissent. Can we legitimately rely on a fact that was not mentioned in the majority opinion? Yes, Your Honor, because we know that that was a fact that was important, and the majority was not persuaded by that fact. And so the license plate is inside the car. Avoiding a future non-safety-related traffic infraction is not a legitimate community caretaking rationale. Moreover, even if it were,  let's imagine a situation where you did have a safety-related infraction, like a broken windshield. Then you say, Mr. Ramos, I'm not going to tow this car right now, but you need to get that auto glass company to come here and fix the windshield before you take it away. Otherwise, you do impound it, and then what happens? The impound lot's not going to let you bring a private contractor onto that impound lot to fix it. It still needs to get fixed. So what, now you have to pay another tow company to take it to your garage? That's not a reason to remove a car from private property. It's not illegal to have a car without a license plate parked on private property. And again, avoiding a future non-safety-related infraction is not a community caretaking rationale. This non-private property that you're describing, it was kind of like a 7-Eleven or a mom-and-pop store, wasn't it? So it may have been parked on, quote, private property, but nonetheless, it's all well lit. It's at a gas station. So those variables apply in this instance. So it may be, under the Sanders factor, private property, but you've got to consider the facts of what are disclosed at that private property, right? 100% this is a fact-based analysis. And here we're in the Sanders universe because this is not a traffic hazard, and it's not a safety risk to the public. Further, it's not blocking anything. It's not abandoned. It's not a nuisance that a private property owner has asked to have removed. And it's not itself in some imminent risk of being harmed. And the question for imminent risk of being harmed, right, we have a finding below not all risk was eliminated. There's some risk. That's going to be true in every case. Sanders, Venezia, Woodard, any case that's going to be true, but it's not the legal question. The legal question, as we know from Venezia, is that we need to know whether whatever the risk is that exists means that the risk is so imminent that other alternatives are not viable. You can't even give Mr. Abramos five minutes to call his mom and see if he can reach her. A minute to say, hey, call in for an impound. Or as even the policy in this case offers as an option to say, you know, if I leave it here, you need to understand that we, the department, are not liable for whatever happens. Because then that places it on Mr. Abramos. He knows the area. He knows his car. He knows if he'd rather pay the impound fees or take the risk of losing his truck or losing what's inside of it. And that is the appropriate community caretaking function of the police, not to do what Officer Puente has said, which is his protocol is as soon as I arrest someone and no one is around, I'll impound their vehicle. That's not reasonable. What do we do with Rodriguez's testimony in two parts? The part where he says, well, there's people walking around. They're always up to no good late at night. And he had had some communication with the manager before, and there was some history of, yeah, she didn't want these vehicles on the property. What do we do with those two pieces of evidence? Because they don't help you. They're against you. Well, they don't help me, but I don't think they help the government because Officer Puentes didn't know about any past having to do with impoundments. And he is the one that makes the decision. That's repeated over and over. Both officers say that that's what the finding of the district court is. And the question is, he can't make this reasonable decision to impound based on, okay, well, I didn't know this at the time. And not even an inference. I mean, this is worse than what you have in order. Not even an inference. I didn't know this at a time, but it turns out maybe sometime in the last 23 years. We don't remember when. Someone here has asked the assistant chief to impound a car before. Even this manager doesn't ever remember that having happened in her 20 plus years at the store. And then in terms of there are people walking around. I mean, sure, there's a risk all the time. The reason why is there a risk isn't a standalone Sanders factor. And instead the question is about alternatives. The risk itself doesn't just create a police interest. The question is, is the risk enough that the police now have this community caretaking interest? And if they're not asking Mr. Ramos if he wants his property protected or saying, you know, we don't take responsibility for this as our policy says we can do, then this idea of like there are people up to no good who, you know, look in closed stores and walk through this one guy's lawn and he keeps calling us about it. That is not a reasonable justification that would justify such an important, like such a deep interference with a private property interest that's both tangible and intangible. If I may reserve the remainder of my time. Thank you. May it please the court. Counsel. My name is Wilson McGarry and I represent the United States. Counsel. One of the questions that Murphy asked at the very beginning, I want to be sure that you and your, and opposing counsel tell me exactly how much time is left. Because that was one of the things that struck me is the time of incarceration. He is incarcerated right now. And I was looking at the number of months and it's pretty close as to how fast this court gets an opinion out and how long he has yet to serve. So I want to know exactly how many days or how many months days he's got left. Because that's going to direct the question of how soon this opinion has to be out in my opinion. Your Honor, off the top of my head, I don't know. I do know that. I didn't figure it did. I'm just telling you I want that answer. Yes. Yes, Your Honor. I believe our records indicate December 21 of this year. No. 2024 is his release date. Oh, yes. Is that right? Yes, Your Honor. I just confirmed that. OK. Because I was thinking it was December of 2023. And I thought, man, my life. So OK. Good. All right. No, Your Honor. I think he got 37 months and he was sentenced in May or June. All right. Thank you. Yes, Your Honor. The Fourth Amendment protects against unreasonable search and seizures. And I believe here the court can affirm the district court's order finding that the impoundment and the inventory search of Mr. Ramos's truck was reasonable under the Fourth Amendment. I really think we have to look at the time. And the time in this case is very important of when these officers made the decisions that resulted in the impoundment. And I believe under the Sanders and the court's precedent that when you look at what the officers, the facts that they were working with at the time that they made the decision to impound that this court can conclude that the decision was reasonable. Mr. Ramos had been arrested. And I believe that, as we point out in our brief, that that was within the confines or guided by the Frederick police officer's policy. He had been arrested. He was alone. This is a very important fact here because I believe this leads to where a lot of these cases turns whether there was a reasonable alternative at the time. There wasn't because Mr. Ramos was alone. He was arrested. The Hop and Sack gas station was closed. It was 1150 when Officer Puentes was there. And it was past midnight when the inventory search took place. And on pages 404 and 405, Officer Puentes testifies that he knew that the license plate was, well, it's obvious that he had acknowledged that he knew from Mr. Ramos that the license plate was in the tow truck. And on 404 and 405, Puentes testifies that he knew that the mom lived three blocks away and that she could have put that license plate on with the tools in the truck. Correct? Your Honor, there's no evidence in the record that suggests that there were actually the tools in the truck that could do that. And yes, Officer Puentes testified, as I paraphrased. Maybe Officer Puentes was wrong about the tools in the truck. But isn't that what he said to Judge Dishman? He said he knew that she lived three blocks away, and I don't dispute that. I do think, though, however, just knowing that someone might live three blocks away at 12 o'clock at night, as the facts bear out in this case, there's no indication of just knowing that she lives there is indicative of whether she will actually be able to get there within a reasonable time frame. And in fact, as the body cam shows at the jail, Mr. Ramos doesn't even attempt to get in touch with her until he gets back to the jail. Tells a friend to get in touch with her. And she gets there within, like, 30 seconds, right? No, it's a few minutes. It's 5 or 10 minutes. I know where you're going with that, Your Honor. After she gets a call from the buddy, he tells the buddy from the jail to call my mom, get there, and, oh, by the way, the tow truck is still there. The tow truck is there. It's important, because this is different than the Braxton case, where the defendant is, or the reasonable alternative person, is there within 30 seconds. A, the inventory had been completed by the time Mrs. We get all that. He doesn't want the poor tow truck guy to lose a commission for the night. We understand that. But I want to go back to my question, because I'm not sure I've heard of the answer, and you may have, and I really didn't. Did Puentes testify that not only did he know the mom, and that she lived three blocks away, but that he knew that she had the wherewithal to put on the license plate? I don't believe he said that she had the wherewithal. I think he said that she might have been able to remit. She might have met or could have. Could have, I think, is correct. And Ramos, we know from the lapel recording, had already known from Ramos that, well, he had already verified that the license plate was in the tow truck. Yes. Yeah, he had actually gone in and looked, and he saw. So he knew that the mom was three blocks away. It's 12-21. Unless maybe she's out partying, maybe she was. But are you saying that there was no reasonable option when the only impediment was this tow truck has to get one minute away, three blocks away, and the mom is available, she's three blocks away, and it's an unreasonable option to say, okay, Ramos, call your mama. Or I know your mama. I'll call her. Maybe she wouldn't answer. Maybe she was out partying or something. But maybe she was at home and could do what she did. Well, as Assistant Chief Rodriguez even points out, once you start getting into calling people, you don't know when they're going to show up. In fact, Ms. Wands, I think was her last name, she had to get a ride over there. She might not have even had her own transportation. You start getting into having to wait on people. And this Court's precedent under Trujillo and others is that there's no affirmative duty for these officers to start undertaking to look for reasonable alternatives. And I think the fact that Mr. Ramos is alone at the time is very important. The fact that they suspect that he's intoxicated. The fact that there's a license plate is important. It's not as Ms. Keeble would argue that it's dispositive of the actual impoundment. I do think it's an important factor that goes to whether reasonable alternatives exist, because it's undrivable, as this Court's pointed out in some of its other cases, that helps. And I do think this case is very close to, as kind of what Judge Murphy put earlier, sometimes older is still good. And I think this case, in a lot of fashions, is similar to the Cornegie case and the Johnson case, which we've cited to. Those three Sanders? Yes, Your Honor. How in the world do we interpret those cases to be applying the five Sanders factors? Well, I do think the facts in those are significant in the fact that they occurred in private property. And I think you can apply the Sanders factors here, just as Judge Dishman did, and find that it was reasonable. You know, as counsel points out, the first Sanders factor is private versus public. As counsel argues, that's not a binary choice, though. You know, it really does weigh generally against impoundment. But I think as the district court correctly found facts in support of, that the risk was not eliminated in this case. And have we ever, and what are Benicia Sanders, have we ever applied the risk of trespass or burglary to the otherwise binary decision on factor one, whether the property itself was private or not? Isn't this the third factor, the reasonableness of options, where you get into whether or not it was a reasonable option to leave the vehicle there because of the risk of vandalism and the like? That's the third factor, not the first. I see what you're saying, Your Honor. And I think at the end of the day, if that's correct, the Sanders factors are non-exclusive. And I think this court can consider all of these facts in reaching the decision that it's reasonable. Whether it fits under, you know, perfectly fits under one of the Sanders factors, like categories or prongs, then I don't think that's dispositive because this court can look at that. Even the signage, for instance, in this case and whether owner's been consulted. I mean, that is a clear statement. They didn't consult. But I do think it's an important fact that this court can consider in guiding Officer Puente's decision to make the impound in this case. You don't dispute, do you, that Officer Puente testified specifically that the lady was still in the store even though it was past 12 o'clock because he goes and talks to her? That's correct, yes. And he just says, you know, it slipped my mind. But you don't dispute, do you, that Puente certainly could have asked her, is it okay to leave this tow truck on the lot to Mama Liz three blocks away? He could have asked the clerk that night. However, I don't think she would have been the ultimate authority to make that decision for the store anyways. As she testified, that decision would have been left to Miss Nation, who testified at the suppression. Maybe it was an error, but it was harmless. The factor is, you either do it or you don't. If the court interprets it that way, then it is. Well, do you. I mean, how else do you interpret the Fifth Sanders factor? I interpret that factor, whether the vehicle's owner or driver have I believe that they consented by posting a sign that voices a clear statement, customer parking only, violators towed. And violators towed goes well beyond this, no trespassers, no cars left over here. This is a clear warning to people that that store does not want that vehicle parked there. And Miss Nation testified to the fact that it's very uncommon for cars and vehicles to be left overnight without receiving express permission. And it doesn't happen very often. And this, I think, goes to the location of the store, being on the Highway 5, the testimony of the officers which Judge Dishman found to be credible and found that those facts that they had responded to the burglaries and recent issues, the heavy foot traffic of folks up to no good, that, you know, I disagree with counsel's interpretation that an imminent threat has to be necessary. A lot of this court, this circuit's language goes to potential that it's, you know, essentially whether it could happen. And I believe that the officers were guided, that was just one factor in guiding their decision, which I believe this court can find that it was a reasonable decision with all the facts that they had at the time that they made that decision. Did Miss Nation testify that the clerk on duty that was closing up did not have authority to say, yes, the truck can be left there? Your Honor, I don't believe she ever was asked that question. What's your basis for saying she did not have that authority? I believe that Miss Ward said that that decision would have been left up to Miss Nation. And because she was the clerk. Okay, so the clerk, Ward, said, I don't have that authority. Yes. All right. Would it have been appropriate in the exercise of community caretaking for, if you want to just say, why don't you give her a call? I don't believe he's obligated to make that, to make that decision. You know, it's a very fluid situation. There's a lot of things going on that they suspect him to be intoxicated, Mr. Ramos to be intoxicated. He's alone. They consider a variety of options to the fact that they did not, unlike some of the other cases, shut down Mr. Ramos asking to call his mother. It's once they see that the license plate isn't properly affixed that they kind of come to the final determination that the most reasonable decision at that time is to impound the vehicle because he's alone and they suspect him to be intoxicated. There's heavy foot traffic in the area. The engine is running and it's closed and publicly accessible at that night. What does the engine running have to do with anything? Just go in and turn it off? Well, I think it's an important fact because the engine running, you know, somebody, like you said, you can turn it off. But then at that point, the officer is then in custody of that and is then liable. What do they do with it next? Where in the record does Fuentes say or Rodriguez say anything about our concerns here are our liability, the liability of the township, the police department? Where is that in the record? I believe in the record it discusses that their policy is that they don't believe. Their policy. But when they're talking about the factors that are affecting them that night, they don't say, well, we don't want to be liable. Well, I do believe that there is at least some testimony with regard to the policy. They didn't want liability issues attached to that. And there is some testimony to that. I don't have a direct site for you right now, Your Honor, but I could provide that to the court. If it's there, we'll find it. If we need it. With that, that's my time. Are there any additional questions? Yeah, we took a little time here at the start, so you can take a little more time. So I think at the end of the day, Your Honor, when you look back, you can conclude that this was reasonable under the Fourth Amendment. I mean, I've harped on it. He was alone. It was on a highway, accessible to the public. I think this is distinguishable from a lot of the opinions that this court has rendered in the past few years. And Chavez points out that subject to potential vandalism or theft on a commercial business, I think this case fits within the confines of what this court has described as what would be a reasonable impoundment. Thank you very much. Okay, let's give the honor. Your Honors, Mr. Ramos told Officer Puentes that his mother was at home. Officer Puentes agreed that if the police had released the vehicle to Mr. Ramos' mother, this would have relieved the police of liability. He testified that, quote, she could have put the license plate on the truck. Even if the sign means exactly what the government says, and even if this all of these things gave community caretaking rationales, you still have the alternative of calling mom who's home three blocks away. This is not Cornegay where you don't even know who you've arrested. It's not Johnson where the person is so drunk that they've passed out and have a firearm next to them, and there's a concern there's another firearm there that needs to be dealt with right away. This impoundment was unreasonable. Thank you. All right, this matter will be submitted. We'll hear the last case of the day.